UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| COKER et al | CIVIL ACTION NO: 15-0007 |
| VERSUS | JUDGE DONALD E. WALTER |
| WHITTINGTON et al | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [Doc. #34] filed by Defendants, Bossier Parish Sheriff Julian Whittington and Chief Deputy Charles Owens. Plaintiffs, Brandon Coker ("Coker") and Michael Golden ("Golden"), oppose the motion. [Doc. #41]. Defendants filed an objection to certain evidence, Exhibits D and D-1 attached to Plaintiff's opposition [Docs. ##41-5 and 41-6], and also filed a reply [Doc. #49].[1] For the reasons assigned herein, Defendants' motion for summary judgment [Doc. #34] is **GRANTED**.

## BACKGROUND FACTS[2]

Pursuant to 42 U.S.C. § 1983, Plaintiffs, Coker and Golden, have alleged violations of their constitutional rights under the First and Fourteenth Amendments.[3] Plaintiffs seek

---

[1] Defendants' objection to Plaintiffs' Exhibits D and D-1 subsumes Defendants' earlier-filed Motion to Exclude Witness Testimony [Doc. #31]. Both documents seek to exclude the testimony of Plaintiffs' proposed expert witness, Dianna Thomas, PhD. For purposes of this ruling, as indicated herein, the Court need not rule on the admissibility of this witness's testimony.

[2] *See generally* Complaint [Doc. #1]; Defendants' Statement of Undisputed Material Facts [Doc. #34-2]; and Plaintiffs' Response thereto and Statement of Uncontested Material Facts [Doc. #41-1].

[3] Plaintiffs' complaint alleged violations of the First, Fourteenth, and Ninth Amendments, as well as Article VI, § 3. Plaintiffs explicitly forego any claims pursuant to the Ninth Amendment and the Establishment Clause and implicitly forego any claims arising under Article VI, § 3, by the lack of substantive briefing thereon. Plaintiffs affirmatively state that the complained-of actions by the BPSO are violative "of their constitutional rights under the First Amendment's right to intimate association and the Due Process Clause rights of notice and privacy." [Doc. #41, p. 14].

compensatory and punitive damages, attorneys' fees, and reinstatement. Defendant Julian Whittington is sued in both his official capacity, as Bossier Parish Sheriff, and his individual capacity; Defendant Charles Owens is sued in his individual capacity only. Defendants argue that their employment actions do not give rise to viable First or Fourteenth Amendment claims, and, in the alternative, qualified immunity attaches to Defendants in their individual capacities.[4]

Most of the facts are not in dispute. At all times pertinent to these proceedings, and until on or about November 24, 2014, Plaintiffs Coker and Golden were at-will employees of the Bossier Parish Sheriff's Office ("BPSO"). Golden became a BPSO deputy in December 2003 and, in November 2014, was working as a BPSO detective. Coker became a BPSO deputy in October 2006 and, in November 2014, was working as a BPSO K-9 officer.

In October 2014, Coker left the matrimonial household that he had shared with Lauren Coker. On or about November 3, 2014, Coker moved in with Farah Golden, who was then still legally married to Golden, and Coker and Farah Golden began openly living as a married couple. At the time of the parties' filings, Coker was engaged to Farah Golden, planning to be married on February 6, 2016. Likewise, in either September or October 2014, Golden left the matrimonial household that he had shared with Farah Golden. On or about November 2, 2014, Golden moved in with Lauren Coker, who was then still legally married to Coker, and Golden and Lauren Coker began openly living as a married couple. Golden and Lauren Coker were married on December 4, 2015.

On or about October 31, 2014, the facts and unusual relationships giving rise to the

---

[4] *See* Doc. #34-13, p. 6. Defendants also substantively attack Plaintiffs' allegations pursuant to the Ninth Amendment and Article VI, § 3. [Doc. #34-13, pp. 14-16].

instant lawsuit were brought to the attention of BPSO's Chief Deputy, Defendant Charles Owens. BPSO's Internal Affairs Section subsequently conducted an investigation, and the results thereof were reported to Sheriff Whittington. On behalf of the Sheriff, Chief Owens then held separate meetings with each Plaintiff. Plaintiffs claim that, during these meetings, Chief Owens told the Plaintiffs that, in order to return to work as a deputy, each would be required to (a) move out of the houses that each currently shared with the other's spouse; and (b) cease all contact with the other's spouse. Defendants agree that Sheriff Whittington directed Plaintiffs to change their living arrangements, such that each was no longer co-habitating with a married woman not his own wife, and that, upon doing so, Plaintiffs would be transferred to corrections positions within the BPSO. Defendants deny that Plaintiffs were ordered to cease all contact or that there was any attempt to dictate or control the Plaintiffs' marital choices. Plaintiffs were each placed on administrative leave, effective November 3, 2014.[5]

Attorneys for both parties exchanged letters on November 12, 14, 19, and 20, 2014.[6] On November 14, BPSO's attorney confirmed that the "decision of the Sheriff is that [Plaintiffs] are on unpaid leave until they cease cohabitating with a married woman not their own wife[;] [o]nce that is corrected, they will be reinstated and transferred to corrections."[7] Plaintiffs' counsel responded that Plaintiffs rejected the Sheriff's decision and were "also concerned about

---

[5] *See* Doc. # 41-10, pp. 17-18; Docs. ## 41-2 and 41-3, p. 4, ¶ 10;

[6] Plaintiffs admit that these communications took place; however, Plaintiffs object to the letters, under Federal Rule of Evidence 408, "as they were part of an effort to return the Plaintiffs to work and thus compromise the claims." *See* Doc. #41-1, p. 4, ¶ 7. Plaintiffs maintain that they were told by Chief Deputy Owens, that they must cease *all contact* with the other's wife. The Court finds that Rule 408 does not prohibit consideration of these letters, the exchange of which Plaintiffs do not dispute.

[7] Doc. #34-8, p. 1.

conditions communicated to them when they were first placed on unpaid administrative leave: that there be no contact between the two couples until a divorce is obtained."[8] That same day, counsel for BPSO responded by, *inter alia*, clarifying BPSO's position, as follows:

> [A]t no time were your clients informed that they were prohibited from having contact with each other. So that we are clear that is not a condition of employment. The issue, as stated in my letter of November 14, 2014, is that your clients are cohabitating with a married woman not their own wife.[9]

And, finally, on November 20, BPSO's counsel advised Plaintiffs' counsel that the Plaintiffs "seem to be confused[,]" as each was inquiring of the BPSO where to show up for work while confirming "that their living arrangements, which is the cause of their suspension without pay, have not changed."[10] Counsel reiterated that the Sheriff's position had not changed, again confirming that "unless and until [the Plaintiffs] stop living with a married woman not their own wife, they cannot return to work with the [BPSO]."[11] Plaintiffs were given a deadline of November 24, 2014, by which to resolve this condition; otherwise, BPSO would consider Plaintiffs to have "freely and willingly terminated their employment with the [BPSO]."[12]

The Sheriff's Office Employee Handbook contains the following provisions:

- 3.01(I)(A)(4): Conduct yourself at all time in such a manner as to reflect the high standards of the Bossier Sheriff's Office; and

- 3.01(II)(A): Do not engage in any illegal, immoral, or indecent conduct, nor engage in any legitimate act which, when performed in view of the

---

[8] Doc. # 34-9 (Letter dated November 19, 2014).

[9] Doc. #34-10.

[10] Doc. #34-11.

[11] *Id.*

[12] *Id.*

4

public, would reflect unfavorable upon the Bossier Sheriff's Office. These requirements have a legitimate law enforcement goal of securing the community's confidence in BPSO's deputies.[13] Additionally, the BPSO Policy and Procedures Manual requires that every employee notify his or her supervisor of any change of address within twenty-four hours thereof. This requirement represents a legitimate law enforcement need to facilitate ease of contact with deputies, and to provide for their welfare and security to them and their families in the event of threats on their lives or property. Despite Plaintiffs' claims that each verbally informed his supervisor that he had moved out of his matrimonial domicile, Plaintiffs admit that neither notified their respective supervisors upon moving into the former matrimonial domicile of the other.

As summarized by Defendants, the instant motion presents the following two issues: (a) whether Plaintiffs have articulated a constitutional violation; and (b) if so, whether Defendants are entitled to qualified immunity. Plaintiffs contend that they were placed on leave and then discharged, or constructively discharged, by Sheriff Whittington and Chief Owens, effective November 24, 2014, in violation of their rights under both the First and Fourteenth Amendments. Defendants contend that Plaintiffs' violations of the Sheriff's Code of Conduct provided legal cause for discharge and that the conditions of Plaintiffs' return to work did not violate any rights.

---

[13] Doc. # 34-3, p. 3, ¶ 9 (Owens' Affidavit); Doc. #34-5, pp. 10-11 (Sheriff Whittington's Deposition, pp. 39-43) (Plaintiffs' living arrangements would "undermine[] their credibility and respect and trust in the people that they're out there dealing with on a daily basis. . . . we are held and should be held to a higher standard."). Plaintiffs purport to dispute this goal with the testimony of Dianna Thomas; however, that witness's testimony, if accepted, serves only to opine that Plaintiffs' living arrangements would not endanger operations. Such an opinion would not serve to dispute the fact that the stated goal of these provisions is that to which the Sheriff and his Chief Deputy testified.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate elements of the non-moving party's case, but need only point out the absence of evidence in support thereof. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311. Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine dispute as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated

---

[14] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this court will rely on it accordingly.

allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

## LAW AND ANALYSIS

To state a section 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

Supreme Court "decisions have referred to constitutionally protected 'freedom of association' in two distinct senses." *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984). In one respect, "freedom of association receives protection as a fundamental element of personal liberty[,]" reasoning that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* at 617-18. "In another set of decisions, the [Supreme] Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 618. If Plaintiffs' association claims are to be protected, they must fall under the former category, for which constitutional protection may derive from either the First or

Fourteenth Amendments.[15] Plaintiffs likewise invoke their right to privacy, the protection of which has involved two different kinds of interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977).[16]

"As the [Supreme] Court's decisions have noted, for many years 'the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights.'" *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "That dogma has been qualified in important respects." *Id.* (citing *Connick*, 461 U.S. at 144-45). For instance, "[t]he [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* However, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* at 418. The Supreme Court has therefore found that the question is not whether the governmental entity can establish a genuine public need for the regulation at issue. *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) (regulating hairstyles of members of uniformed police force

---

[15] *Compare Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003) (right to liberty under Due Process Clause provides full right to engage in private sexual conduct without intervention of the government where statute furthered no legitimate state interest justifying the intrusion), *and Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) ("These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment."), *with Wallace, supra,* 80 F.3d at 1051 ("The Supreme Court has recognized that the First Amendment protects a right of association[.]") (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 22–24 (1989)), *and Roberts, supra,* 468 U.S. 609 (1984).

[16] Cases reflect upon the privacy protections provided by both the First and Fourteenth Amendments. *See e.g. Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) ("the First Amendment has a penumbra where privacy is protected from governmental intrusion."); *NAACP v. State of Alabama*, 357 U.S. 449, 462 (1958) (in finding a denial of Fourteenth Amendment due process, the Court protected the freedom to associate and privacy in one's associations and noted that freedom of association was a peripheral First Amendment right).

did not violate any Fourteenth Amendment right, as member's "liberty" interest was not treated same as that of member of general public). Rather, "[t]o sustain the attack on these police personnel regulations, the plaintiff officers must 'demonstrate that there is no rational connection between the regulation, based as it is on the [parish's] method of organizing its police force, and the promotion of safety of persons and property.'" *Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir. 1983) (quoting *Kelley*, 425 U.S. at 245).[17]

Here, Plaintiffs argue that the Code of Conduct, combined with the alleged restriction that each deputy cease all contact with the other's spouse, violates Plaintiffs' rights of association; due process rights to be free of vague undefined restrictions in public employment; and substantive due process rights of marital and sexual privacy. Plaintiffs argue that they were required to guess what actions or activities might be considered by Defendants to reflect negatively upon the BPSO, and that even Defendant Owens admitted that he was unsure exactly what constituted "immoral," and thus prohibited, behavior. Plaintiffs rely on Defendant Owens' deposition to create ambiguity; however, Owens actually testified, as follows, in pertinent part:

> There are a lot of possible violations to marriage vows. . . . What we're talking about in this particular case is the sexual intercourse, sexual relations, the appearance of adultery, wife swapping, whatever you call it, that would constitute in most people's mind a violation of the marriage vows and violate the marriage trust.[18]

The affidavits of Plaintiffs Golden and Coker state that each of their interviews with internal affairs dealt solely with their living arrangements with the other's spouse; that each was placed

---

[17] The Fifth Circuit has acknowledged that *Lawrence* did not categorize the right to sexual privacy as a fundamental right, implying that rational basis review applies to this decision. *See Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 745 n. 32 (5th Cir. 2008).

[18] Doc. #41-4, p. 45.

on paid administrative leave due to their co-habitating with a woman who is not their wife; that Chief Deputy Owens advised Plaintiffs that they "could not return to work until they changed and stopped their living arrangements[;]" and that Chief Deputy Owens "further advised the Plaintiffs that their living arrangements [were] a violation of the Sheriff's Code of Conduct."[19] Each Plaintiff's affidavit also states that Owens advised that a "further condition of re-employment would be that the Plaintiffs cease all contact with the woman with whom they were currently co-habitating out of wedlock until they obtained divorces."[20]

    Defendants argue that, while Plaintiffs assert that there is no rational interest in regulating the extramarital affairs between two deputies and their respective wives, Defendants clearly have an interest in promoting a cohesive police force and in upholding the public trust and reputation of the police force. Defendants emphasize that the extramarital affairs at issue in this case occurred openly and involved continuing extramarital relations of two deputies, each of which was involved with the wife of the other deputy. In addition to the Fifth Circuit cases analyzed below, Defendants reference an Eastern District of Michigan decision, in which summary judgment was granted in favor of a township that had discharged the plaintiff, a former police officer, for engaging in an adulterous affair with the estranged wife of a fellow officer. There, the court held that the discharge, after plaintiff was given the option of terminating the relationship to maintain employment and/or resigning, did not abridge the plaintiff's free association and privacy rights under the First and Fourteenth Amendments. *Mercure v. Van Buren Twp.*, 81 F. Supp. 2d 814 (E.D. Mich. 2000). As explained below, this Court adopts the

---

[19] Docs. ## 41-2 and 41-3, pp. 4-5, ¶¶ 10, 11, and 12.

[20] *Id.* at p. 5, ¶ 11; *but cf.* Doc. # 34-3, p. 1, ¶2; and Docs. ## 34-7, 34-8, 34-10, and 34-11.

following statement in *Mercure*: "Although there is no consensus in the case law as to the precise contours of the 'sexual privacy' and 'intimate association' rights at issue here, the Court readily concludes that these rights do not encompass Plaintiff's conduct in this case." 81 F. Supp. 2d at 822.

In *Shumpert v. City of Fulton*, 77 F.3d 474 (5th Cir. 1995) (per curiam), an unpublished opinion, the Fifth Circuit affirmed summary judgment in favor of the City of Fulton, Mississippi, after it discharged a police officer for participating in an extramarital affair in violation of the Fulton Police Department's conduct regulations. The plaintiff-officer alleged, *inter alia*, that, pursuant to 42 U.S.C. § 1983, dismissal for having an extramarital relationship violated his First Amendment rights to privacy and free association. *Shumpert*, 77 F.3d at *1. Prior to *Shumpert*, the Fifth Circuit "held that relationships outside of marriage do not garner absolute constitutional protection." *Id.* at *2 (citing *Shawgo, supra*, 701 F.2d 470). *Shawgo* specifically "found that, when such relationships occur between government employees, any right to such relations that might normally exist may be properly tempered by a state's heightened interest in regulating the conduct of its employees." *Id.* (citing *Shawgo*, 701 F.2d at 482-83). "[T]o sustain a constitutional attack on police personnel regulations, a plaintiff must establish that no rational relationship exists between the regulation and the safety of people and property that police are employed to protect." *Id.* (citing *Shawgo*, 701 F.2d at 483). Accordingly, in *Shumpert,* the City's requirement, that police officers maintain their private lives to be "unsullied as an example to all," could rationally advance the legitimate law enforcement goal of securing the community's confidence in the integrity of its police officers. 77 F.3d at *2. The plaintiff-officer's conduct was therefore not protected by the First Amendment. *Id.*

In *Shawgo*, upon which the Fifth Circuit relies in *Shumpert*, the plaintiffs were two former Amarillo police officers, who had sued, among others, the City of Amarillo, Texas, and the Chief of Police, for instituting disciplinary action against the plaintiffs for off-duty dating and cohabitation, in violation of departmental and city rules. 701 F.2d at 472.[21] In finding no federal due process violations, the Fifth Circuit explained, *inter alia,* that the plaintiffs' underlying conduct was "not independently protected by the Constitution (as is, for example, first amendment speech)[.]" *Id.* at 479. Finding that the plaintiffs were not constructively discharged, the *Shawgo* court again acknowledged that the case did not implicate the employees' exercise of constitutional rights, and stated that "the plaintiffs' resignations resulted from the embarrassment that may be consequent to any required disciplinary proceedings, not from any constitutionally (or otherwise) inhibited action by the employer that made intolerable the employees' continuance in governmental service." *Id.* at 482. And, finally, *Shawgo* found that the plaintiffs' right to privacy was not infringed by the scope of the regulation proscribing, as conduct prejudicial to good order, cohabitation of two police officers, and further explained:

> The fourteenth amendment "protects substantive aspects of liberty"—including freedom of choice with respect to certain basic matters of procreation; marriage, and family life, *see, e.g., Roe v. Wade,* [*supra*, 410 U.S. at 153]; *Griswold*, [*supra*, 381 U.S. at 485]—"against unconstitutional restrictions by the state." *Kelley*, [*supra*, 425 U.S. at 244]. The first amendment additionally imbues the right to privacy to include protected forms of "association" for social

---

[21] Plaintiffs attempt to distinguish *Shawgo*, at least in part, by claiming that its holding was based on a finding that "an inferior and superior officer [moving] in together could affect command and control." *See* Doc. #41, p. 23, n. 4. However, there were two separate issues in *Shawgo*: Officer Whisenhunt was both engaging in (a) off-duty dating and overnight stays (cohabitation) with a female, unmarried, non-subordinate officer (Shawgo); and (b) cohabitation, or sharing an apartment, with a male, subordinate officer (Edwards). *See Shawgo*, 701 F.2d at 472-73. The Fifth Circuit thus agreed "with the district court that, in the present circumstances, the plaintiffs' right to privacy has not been infringed by the scope of the regulation proscribing, as conduct prejudicial to good order, cohabitation of two police officers, or proscribing a superior officer from sharing an apartment with one of lower rank." *Id.* at 482.

> as well as political reasons. *See Griswold, supra,* 381 U.S. at 483. [¶] . . . [T]he right to privacy is not unqualified, *Roe v. Wade, supra,* 410 U.S. at 154, and [] the state has "more interest in regulating the activities of its employees than the activities of the population at large," *Kelley, supra,* 425 U.S. at 245. [¶] . . . [W]e can ascertain a rational connection between the exigencies of Department discipline and forbidding members of a quasi-military unit, especially those different in rank, to share an apartment or to cohabit. [¶] The plaintiffs also claim that their constitutional rights to privacy were violated by the investigatory surveillance of their off-duty association. . . . [P]olice officers enjoy no constitutionally protected right to privacy against undercover and other investigations of their violations of department regulations or (although not in the present case) of law. [¶] We thus find that no constitutional privacy rights of the plaintiffs were offended.

*Shawgo,* 701 F.2d at 482-83.

The Court finds no basis, in Fifth Circuit or Supreme Court precedent, upon which to find that Defendants have improperly infringed upon Plaintiffs' constitutional rights, in the context of their employment as BPSO deputies. Sheriff Whittington is a publicly elected official, responsible for and answerable to those who reside within the jurisdiction of Bossier Parish. The fact that Plaintiffs may disagree with, or find unfair, Sheriff Whittington's decisions, in the context of their employment with the BPSO, does not rise to the level of a constitutional violation. *See Connick, supra,* 461 U.S. at 146 ("Perhaps the government employer's dismissal . . . may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable."). It is a "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 143. Although Plaintiffs are correct in pointing out changes in the jurisprudential landscape in the wake of *Lawrence v. Texas,* this Court does not find any such shift to have as wide-sweeping an effect, as that advocated by Plaintiffs, on the courts' involvement in

13

governmental entities' employment decisions.[22]

Plaintiffs attempt to create genuine disputes of material facts, based on the following: (a) Plaintiffs' uncorroborated allegations that Owens conditioned Plaintiffs' return to employment on ceasing *all* contact with each other's spouse; (b) Plaintiffs' expert Dianna Thomas's opinion that Plaintiffs' living arrangements would have no effect upon Plaintiffs' respective performance in their jobs; and (c) the fact that a single person, unknown to the Sheriff personally, and perceived by Plaintiffs to be simply a "nosy neighbor," is insufficient to establish that the deputies were living with each other's wives as of October 31, 2014. The Court is unpersuaded by these arguments. As to the alleged order to cease contact, all other evidence contradicts Plaintiffs' claims that their return to employment was predicated on anything other than simply ceasing their living arrangements with a married woman not their own wife. As to Plaintiffs' expert, even if accepted, her opinion does not negate or sufficiently undermine the Sheriff's decision that Plaintiffs' living arrangements violated the BPSO's Employee Handbook sections 3.01(I)(A)(4) and 3.01(II)(A), the legitimate goal of which is to secure the community's confidence in the BPSO and in the integrity of its deputies. And, finally, Plaintiffs cannot plausibly deny that each was living with a married woman not their own wife, and continued to do so, despite their return to work being explicitly conditioned upon the termination of those adulterous living arrangements. Plaintiffs could have terminated their living arrangements until

---

[22] Although *Lawrence* acknowledged "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex[,]" such an awareness does not undermine the ability of governmental entities, and particularly local law enforcement agencies, to regulate their employees' conduct. *See* 539 U.S. at 572; *see also Shawgo*, 701 F.2d at 482-83 (plaintiff-officers' argument, that state could not regulate personal, off-duty association that led to marriage, failed to take into account that the right to privacy is not unqualified and that the state has "more interest in regulating the activities of its employees than the activities of the population at large") (internal citations omitted).

such time as their divorces became final, in order to return to work. They chose not to do so, thereby causing the termination of their employment as BPSO deputies.

The above discussion applies with equal force to Plaintiffs' claimed rights under both the First Amendment and the Fourteenth Amendment's substantive due process protections. Plaintiffs also allege that the Sheriff's Code of Conduct is unconstitutionally vague and overly broad. Plaintiffs contest the Code's requirement that deputies' conduct reflect the high standards of the BPSO and its prohibition against deputies engaging in any "illegal, immoral or indecent conduct, nor engag[ing] in any legitimate act which when performed in view of the public, would reflect unfavorabl[y] upon the [BPSO]."[23] Plaintiffs claim that the Code "permits the Sheriff to enforce his private code of morality upon his deputies."[24] The Court agrees with Defendants that the Sheriff's Code of Conduct does not offend the minimum requirements of federal due process, especially with regard to discipline that is not in itself constitutionally protected and that was reasonably within the scope of the regulations' prohibitions. *See Shawgo, supra*, 701 F.2d at 477-79. There is no question that each Plaintiff's choice, to live with a married woman not his own wife, was "immoral" conduct, in violation of the Code, as written and as applied. After the internal affairs investigation sustained the complaints, and Plaintiffs were placed on administrative leave, Plaintiffs were given the option of changing their living arrangements, in order to return to employment with the BPSO, and chose not to do so. The Court finds no violation of Plaintiffs' due process rights.

Regarding Plaintiffs' claims arising under the Ninth Amendment, the Fourteenth

---

[23] Doc. #1, pp. 6-7, ¶ 15.

[24] *Id.*

Amendment's Equal Protection Clause, and Article VI, § 3, a motion for summary judgment "cannot be granted simply because there is no opposition." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995). When no response is filed, however, the Court may accept as undisputed the facts set forth in support of the motion and grant summary judgment when a prima facie showing for entitlement to judgment is made. *See Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). The Court finds that Defendants are entitled to summary judgment on each of those claims.[25] Because the Court found no violations of the Plaintiffs' constitutional rights, under either the First or Fourteenth Amendments, the Court need not reach the issue of qualified immunity.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. #34] is hereby **GRANTED**. Plaintiffs' claims are hereby **DISMISSED WITH PREJUDICE.**

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 14 day of March, 2016.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

---

[25] *See* Doc. #34-13, pp. 14-18.